ISOLANTITE, INC., a corporation of the State of Delaware, complainant-respondent, and CHEMICAL AND OIL WORKERS UNION No. 22026, A. F. of L., intervening complainant-respondent,

*v.*

UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA, affiliated with the CONGRESS OF INDUSTRIAL ORGANIZATIONS et al., defendants-appellants.

[Argued May 25th, 1942.   Decided December 3d, 1942.]

*Mr. Samuel I. Rothbard,* for the appellants.

*Messrs. Pitney, Hardin & Ward (Mr. Donald B. Kipp,* of counsel), for the respondent.

*Mr. Jacob Friedman (Mr. Morris F. Pearlman,* of counsel), for the intervening respondent.

The opinion of the court was delivered by

PERSKIE, J.

This is a labor dispute. Anti-Injunction Act, *P. L. 1941 ch. 15 p. 27; N. J. S. A. 2:29-77.1, et seq.* We are called to pass upon the propriety of the restraints and provisions imposed, by the *pendente lite* order under review, upon the labor union and its named participants, all defendants-appellants.

As to the facts which are fully stated in the opinion, *ubi supra,* it is sufficient to observe that respondent, Isolantite,

Inc. (hereafter referred to as the Company), is a Delaware corporation which operates, as it has operated, for about twenty years last past, a plant at Belleville, New Jersey, where it manufactures "high frequency ceramic insulation for radio instrument and equipment," now an "absolutely essential" war product. For about a year prior to October 10th, 1941, the date of the filing of the bill, over 80% of the company's products were purchased for the war needs of the United States government.

While the company was so operating, a jurisdictional dispute arose between two rival labor unions for the right to act as the exclusive bargaining agent for the company's employees. More specifically, appellant union (affiliated with the Congress of Industrial Organizations, and hereafter referred to as C. I. O. union) set out to organize the company's employees to the end of supplanting the intervening respondent (affiliated with the American Federation of Labor, and hereafter referred to as the A. F. L. union) in its contractual status as the exclusive bargaining agent for the company's employees. The company employed 575 workers, approximately 80% of whom were females.

In pursuance of its planned action, the C. I. O. union apparently gained the support of one Melchionne, a member of the A. F. L. union and employed by the company. For his disloyalty, Melchionne was expelled from his union. Additionally, his union made demand upon the company that he be dismissed from his employment. The company pursuant to its contract with the A. F. L. union, "to employ or retain in its employ only members in good standing in the union," dismissed him.

The dismissal of Melchionne provided the incident which forthwith precipitated the planned strike and its concomitant activities, such as alleged mass picketing in front of the only entrance to the plant (so limited at the suggestion of a federal agency to avoid sabotage), intimidating of employees who desired to continue in their employment, directing insulting, abusive and obscene epithets at the employees, committing acts of violence upon them, and threatening them with acts of violence and the like.

In this posture of affairs, the company filed a bill of complaint praying for an injunction against all picketing and for other relief. The company also sought to obtain a rule to show cause with *ad interim* restraint. On due notice and hearing the prayer against the picketing was denied but the following *ad interim* restraints were imposed upon the appellants:

"(a) From gathering, parading or patrolling, loitering or picketing about the premises of complainant, or the public street or sidewalks approaching thereto, or in the vicinity thereof, particularly on Cortland Street between Holmes and Joralemon Streets; provided, that not more than ten pickets may peaceably walk up and down the sidewalks or the street in front of complainant's plant upon condition that they maintain a space of at least ten feet between each such picket and that they or any of them do not obstruct the entrance to the plant or molest or interfere with the entry into or egress from said plant by any employees, servants or agents of complainant or any person having business with complainant;

"(b) From violence or threats of violence or intimidation practiced upon any person now employed or hereafter to be employed by complainant, or who is willing to be employed by complainant;

"(c) From using obscene or insulting language;

"(d) From intercepting, molesting or following any person now employed or hereafter to be employed by complainant, or who is willing to be employed by complainant on his or her way to or from complainant's plant; or at any other place;"

Upon considering further proofs offered (in part by affidavits and in part by the examination and cross-examination of witnesses in open court) at the several hearings on the rule to show cause, the learned Vice-Chancellor made the finding of facts (prescribed by *N. J. S. A. 2:29-77.3* and *2:29-77.5*) and, by order of December 16th, 1941, continued the aforesaid restraints until final hearing, adding subdivision (e) as follows:

"(e) From ordering, commanding, directing, assisting, aiding or abetting in any manner whatsoever any person or per-

sons who attempt to violate or who violate the terms of this order."

Appellants attack the restraints thus imposed upon them, and other provisions of the order.

In support of their attack appellants argue that the limitation of their right to picket impairs the right of free speech guaranteed to them under our Federal and State Constitutions, and that the restraints imposed trench upon our Anti-Injunction Act, *supra*, as to the procedure followed and as to the scope of the relief granted.

Respondents, on the other hand, in defense of the restraints, argue that our Anti-Injunction Act, *supra*, "is at best a procedural statute" whose "mandates they have fully complied with." And respondents conclude with the passing suggestion (without argument) that any other construction would render the act unconstitutional as an attempt" by legislative fiat to impair the jurisdiction of the Court of Chancery," that "to deny litigants the aid of [Chancery] in enjoining acts of violence and intimidation would be in direct contravention of article 1 of our State Constitution and in violation of the Fourteenth Amendment to the United States Constitution," and that if the act (*N. J. S. A. 2:29-77.1*) be construed as purporting to change "the substantive law of contracts and of torts," it is void because it violates article IV, section 7, paragraph 4 of our State Constitution, which among other things, provides that "every law shall embrace but one object, and that shall be expressed in the title."

In light of the arguments thus made, we deem it advisable before considering and determining the validity of the attack made upon each restraint and provision imposed, to make some preliminary observations concerning our Anti-Injunction Act, which act is before us for the first time.

By this act, our legislature established the public policy of our state. It is a policy which falls in the class referred to in *Hotel and R. E. Int. Alliance* v. *Wisconsin E. R. Board*, U. S.   ; *86 L. Ed. 567, 570*, as "furthering desirable industrial relations." Such a policy is within the ambit of the proper exercise of legislative power so long as "rights" guaranteed by our constitutions (federal and state) are

"respected" (*Hotel and R. E. Int. Alliance.* v. *Wisconsin E. R. Board, supra*), and so long as "rights" of suitors otherwise established are not impaired. Thus if the stated rights are not impaired, the provisions of the act, designed to make the declared public policy of the state a reality, should be followed and observed.

A reading of this act clearly indicates that it was not designed to impair, nor does it impair, the inherent power which our Court of Chancery has heretofore exercised, in a proper case, to issue restraints and injunctions comparable to those which were issued in the case at bar. *Cf. Evening Times, &c., Publishing Co.* v. *American Newspaper Guild, 124 N. J. Eq. 71; 199 Atl. Rep. 598; International Ticket Co.* v. *Wendrich, 123 N. J. Eq. 172; 196 Atl. Rep. 474.*

It is equally clear that the act was designed merely to regulate the procedure which must be followed to obtain the injunctive relief and to limit the scope of the relief granted. *Cf. Newark Milk, &c., Co.* v. *Milk Drivers, &c., Local No. 680, 19 N. J. Mis. R. 468, 473; 19 Atl. Rep. (2d) 236.*

In thus construing the act, we desire to emphasize that when, as here, the question is whether the legislature has acted in excess of power, we consider only the actual issues raised in the case before us. *Cf. Michaelson* v. *Wall Township, 90 N. J. Law 72, 77; 108 Atl. Rep. 145.* Or as otherwise stated, where questions respecting the application of constitutional guarantees are abstract or hypothetical, they will not be anticipated. *Cf. Allen-Bradley Local, &c.,* v. *Wisconsin Empl't Rel. Board,* U. S. ; *86 L. Ed. 802,* and cases collated at *p. 805.*

There is, therefore, no occasion on the record before us to express or intimate an opinion as to respondents' suggested invalidity of the act in light of one or more of the severable provisions of *N. J. S. A. 2:29-77.1,* not here in issue.

We now proceed with our consideration and determination of the broadly stated grounds of appellants' attack upon the respective restraints imposed upon them.

1. *As to procedure followed.* The attack upon the procedure followed is that the learned Vice-Chancellor erred in relying on written affidavits filed in support of the bill and

ordering appellants to file answering written affidavits thereto. The Vice-Chancellor did more. He provided that the hearings on the return of the rule to show cause should be held on the stated affidavits, "testimony" already taken in open court, and on "proofs presented upon the return * * * on such issues and within such limits as the court shall then determine."

Obviously, the legislature sought to avoid the abuses flowing from the issuance of injunctive relief based upon "written affidavits alone and not wholly or in part upon examination, confrontation and cross-examination of witnesses in open court" (*N. J. S. A. 2:29-77.2*), and to avoid the "grave error" flowing from determination of "issues of veracity and of probability of fact from affidavits of the opposing parties that are contradictory * * *," (*sub. (b)*, *N. J. S. A. 2:29-77.2*). Hence, it provided that no "temporary or permanent injunction" be issued "in any case growing out of a labor dispute" except after, among other things, "hearing the testimony of witness in open court with opportunity for cross-examination." *N. J. S. A. 2:29-77.3*.

Here the injunctive relief was "preceded by" and "conditioned upon" due notice and hearing. Roughly calculated, about one-third of the proofs offered and considered were upon "written affidavits" and the remaining two-thirds were upon the "examination, confronting and cross-examination of witnesses in open court." *N. J. S. A. 2:29-77.2* Apart, however, from the stated ratio of the proofs, the Vice-Chancellor makes clear that the reliance had on the "written affidavits" related to uncontradictory matters and that the oral proofs related to the contradictory matters arising out of the facts stated in the "written affidavits" of the respective parties. Thus while we are not to be understood as placing our stamp of approval upon deviation from the prescribed statutory procedure, we are satisfied that, under the facts of this case, the procedural requirements were satisfied.

2. *As to the scope of the relief granted. Provision (a).* Just because the Vice-Chancellor would not permit picketing *en masse* and limited the number of pickets to "ten," which number he found to be "enough" and "yet not too many,"

appellants argue that their right of free speech was impaired. *Cf. Thornhill v. Alabama, 310 U. S. 88; 84 L. Ed. 1093; Carlson v. California, 310 U. S. 106; 84 L. Ed. 1104.* The argument is specious. It completely ignores the settled principles that the workingman's right to picket, as a "means of communication," is a qualified right. His picketing must be peaceful. *Cf. Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc., 312 U. S. 287; 85 L. Ed. 836.* His picketing must be free from intimidation, coercion, duress, fraud, threats, force and violence. *Cf. E. L. Kerns Co. v. Landgraf, 128 N. J. Eq. 441, 443; 16 Atl. Rep. (2d) 623; 131 A. L. R. 1063.* In the language of our Anti-Injunction Act, *supra* (*N. J. S. A. 2:29-77.1(e)*), his picketing must be "without fraud or violence, or by any other method not involving fraud or violence, and not in violation of any other law of the State of New Jersey." His picketing must not be set in a "background of violence," nor must it be "enmeshed with contemporaneously violent conduct all of which is concededly outlawed." *Cf. Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc., supra; Hotel and R. E. Int. Alliance v. Wisconsin E. R. Board, supra; Allen-Bradley Local, &c., v. Wisconsin Empl't. Rel. Board, supra; Heine's, Inc., v. Truck Drivers, &c., Local 676, 129 N. J. Eq. 308, 313; 19 Atl. Rep. (2d) 204.* While the violence in the case at bar was not as intensive or destructive as the violence for example in the *Meadowmoor Case* where the restraint against all picketing was sustained, the violence was, as in the *Meadowmoor Case*, neither "episodic" nor "isolated" and it was clearly within the all inclusive legislative interdiction against violence.

We need hardly labor the point that picketing *en masse* "may amount to intimidation." (*Cf. Keuffel & Esser v. International Association of Machinists, 93 N. J. Eq. 429, 431; 116 Atl. Rep. 9.*) Such picketing—it was so conceded on the argument—was planned as the most effective method to coerce the workers to join in appellants' objective, and we hold that it was also planned to intimidate the workers and their employer. Picketing so conducted occasions "imminent and aggravated dangers." (*Cf. Thornhill v. Alabama,*

*supra.*) It engenders, as it did, violence, such as scratching, kicking and hitting, and tearing off the dresses of the females and throwing of objects at the non-striking employees, assaults and batteries upon the officers of the law who sought to preserve the peace, and otherwise creating breaches of the public peace. Such conduct is outlawed.

Nor need we labor the point that it was altogether reasonable and proper, in the circumstances, to protect the co-relative rights of those affected by limiting the "number" of pickets, the "space" to be maintained between each picket, and restricting the pickets from obstructing "the entrance to the plant," or "molesting or interfering" with rights of the employees and "those having business with the company" to enter and leave the plant. Compare comparable restraints we sustained in *Snead & Co.* v. *Local No. 7, Int. Molders, &c., 103 N. J. Eq. 332; 143 Atl. Rep. 331.*

We are, however, of the mind that the terms of the restraints thus imposed require some clarification. Terms of restraints should be "clear and certain" on their face. *Cf. Evening Times, &c.,* v. *American Newspaper Guild, supra* (at *p. 76*). They should be defined by "clear and guarded language." *Cf. Milk Wagon Drivers Union* v. *Meadowmoor Dairies, Inc., supra* (at *p. 296*); *85 L. Ed. 843.* It will be observed that the restraints provide, *inter alia,* "that the pickets may peaceably walk up and down the sidewalks or the street in front of complainant's plant * * *." While we do not construe the quoted language as meaning that appellants may not peaceably picket elsewhere in Belleville, New Jersey, there is perhaps some reasonable doubt on that score. Hence we direct that the quoted language be clarified to the end that appellants are free peaceably to picket at other places in Belleville, New Jersey, should they so desire. *Cf. E. L. Kerns Co.* v. *Landgraf, supra.*

*Provision (b).* In light of what has already been written as to intimidation and violence, there remains only to be considered the propriety of the restraint here imposed against threats of violence.

Because of the conflicting proofs as to "threats" as distinguished from "actual violence," the Vice-Chancellor said,

in his opinion, "I make no finding that there were such threats." If this had been the final conclusion of the Vice-Chancellor then this restraint would have been improper. For a charge made and not proved has no place in a decree either under the common law (*Cf. E. L. Kerns Co.* v. *Landgraf, supra* (at *p. 444*); *Blonder* v. *United Retail, &c., Local No. 108, 129 N. J. Eq. 424; 19 Atl. Rep. (2d) 786*), or under the provisions of our Anti-Injunction Act (*N. J. S. A. 2:29-77.1* and *2:29-77.3*). But in his final, formal "findings of fact," the Vice-Chancellor found (e) that defendants "threatened complainant's employees with acts of violence." It is that finding of fact which we review. Do the proofs support that finding on which in turn the restraint imposed must stand or fall? We think that the proofs fully support the final and formal "findings of fact" as made by the Vice-Chancellor. There is a plenitude of proof in support of the charge of threats of violence by appellants. Without attempting to detail these proofs, it shall suffice if we but state that they run from common threats such as "we will get you" to "if you go to work tomorrow, I will kill you."

*Provision* (*c*). We think that there was an abundance of proof as to the use of "opprobious" language condemned in *Evening Times, &c.,* v. *American Newspaper Guild, supra* (at *p. 77*), and as to the use of "fighting words" without the "disarming smile" condemned in *Chaplinsky* v. *New Hampshire,     U. S.   ; 86 L. Ed. 671, 674.*

*Provision* (*d*). We think that the language of this restraint is too broad. "Intercepting" or "following" solely for the purpose of making known, or communicating one's views to others, is not in and by itself necessarily unlawful. It is only if the "intercepting" or "following" constitutes a wrongful, a prohibited act, that it is properly subject to restraint. This provision should be modified accordingly.

*Provision* (*e*). The argument made is that the language "in any manner whatsoever" is entirely too broad. In support of that argument it is suggested that appellants "might conceivably be held guilty of violating this order if they contribute in any way to a fund to pay counsel for representing a person charged with contempt for having violated this

injunction, or even if they raise bail to have such person released from confinement or if they paid for an appeal from an adjudication of contempt, or if they paid such a person any strike benefits."

We do not so construe this provision. Moreover, none of the stated acts is subject to restraint. But there is a reasonable question whether the stated acts could be considered as a violation of the letter of the restraint. Broadly construed, the provision is again all-inclusive. It should be clarified so that the words "in any manner whatsoever" be limited to the violation of the restraints imposed under subdivisions (a), (b), (c) and (d) of the order under review.

*As to other provisions. Failure to exact a surety on the bond and alleged inadequacy of the amount of the bond.* Our Anti-Injunction Act (*N. J. S. A. 2:29-77.3*), concededly makes no provision for a surety on the bond. The act in this respect exhibits a *"casus omissus"* which this court cannot supply by judicial construction. *Cf. Public Service Co-ordinated Transport* v. *State Board of Tax Appeals, 115 N. J. Law 97, 103, 104; 178 Atl. Rep. 350; Studerus Oil Co., Inc.,* v. *Jersey City, 128 N. J. Law 286, 291; 25 Atl. Rep. (2d) 502.* If this omission is to be cured, it can only be cured by the legislative branch of our government.

We think that the amount of the bond, to wit, $500, was, under the circumstances, sufficient.

We have considered all other points argued and find them to be without merit.

The cause will be remanded to the court below with directions that the order under review be modified consistently with this opinion. And since both parties are successful "in one or more substantial issues," no costs are allowed to either. *Cf. Moore* v. *Splitdorf Electrical Co., 114 N. J. Eq. 358, 368; 168 Atl. Rep. 741.*

*For modification*—THE CHIEF-JUSTICE, PARKER, CASE, BODINE, DONGES, HEHER, PERSKIE, PORTER, COLIE, DEAR, WELLS, RAFFERTY, HAGUE, JJ. 13.